UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | 08 Civ. 10760 (WHP) |
| Plaintiff, | : | MEMORANDUM & ORDER |
| -against- | | |
| ZURICH FINANCIAL SERVICES, | : | |
| Defendant. | : | |

----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/30/11

WILLIAM H. PAULEY III, District Judge:

This case presents yet again the confounding question: who will guard the guardians? On December 11, 2008, the United States Securities Exchange Commission ("SEC") filed this action against Zurich Financial Services ("Zurich") for its alleged role in inflating the financial performance of Converium Holding AG ("Converium") in connection with Converium's initial public offering on December 11, 2001 (the "SEC Action"). It followed on the heels of a settlement of a private class action brought by investors against both Converium and Zurich in this district (the "Private Class Action"). See In re: SCOR Holding (Switzerland) AG Litig., No. 04 Civ. 7897 (DLC). As part of the Private Class Action settlement, Converium and Zurich agreed to pay $84.6 million to a fund to be distributed to a certified class of Converium shareholders. See In re: SCOR Holding (Switzerland) AG Litig., No. 04 Civ. 7897 (DLC) (ECF Nos. 251, 264).

Both the SEC and Zurich proposed to end the adversarial process in the SEC Action the very day this lawsuit was filed. They simultaneously presented a proposed final

-1-

judgment requiring that Zurich pay $1 in disgorgement and $25 million in civil penalties. This Court entered the Judgment as a matter of routine. (ECF No. 2.)

The Judgment provided that the SEC "may by motion propose a plan to distribute the Fund." On February 4, 2009, Zurich deposited $25,000,001 in a Court Registry Investment System account. Six months elapsed without any communication from the SEC. By Order dated August 7, 2009, this Court directed the SEC to shake off its lethargy and provide a status report regarding plans for distribution of the Fund. (ECF No. 4.) When the SEC failed to provide any report, this Court scheduled a conference to provoke some activity by the agency. (ECF No. 7.)

In September 2009, the SEC presented a plan of distribution to the Court. The SEC's pro forma motion papers in support of the plan summarized the background of the SEC Action and proposed the creation of a fund pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002 ("Distribution Plan"). (ECF No. 11-4.) As part of its motion, the SEC nominated Garden City Group, Inc. ("GCG") as Claims Administrator and Damasco Associates as Tax Administrator. Aside from Zurich's objection to a characterization of its conduct in the SEC's memorandum, no interested person submitted an opposition. Thereafter, this Court approved the Distribution Plan. (ECF No. 18.) During the ensuing eighteen months, GCG implemented the Distribution Plan.

GCG moves for payment of its fees, expenses, and costs totaling $1,083,911.88 before distributing the balance of the Fair Fund to aggrieved investors. Specifically, GCG seeks $455,471.35 in fees, $99,766.656 in expenses, and $528,673.88 in publication costs. The invoice dated October 1, 2010, is the only support for this application. It does not describe who

provided the services, when those services were provided, or what hourly rates were charged. (ECF No. 27-1.) It also purports to include fees and expenses for services rendered prior to this Court's appointment of GCG as Claims Administrator in February 2010. Finally, the invoice totals $870,070.01, while GCG's latest application seeks $1,083,911.88. The additional $213,841.87 sum is not supported by anything. This Court has cautioned the SEC about its responsibility to review and audit fees and expenses submitted by its nominees. See SEC v. Northshore Asset Mgmt., No. 05 Civ. 2192 (WHP), 2009 WL 3122608 (S.D.N.Y. Sept. 29, 2009) (ordering the SEC to audit all fees and expenses paid to a receiver without meaningful review, resulting in disgorgement of $4,960,000.)

GCG's application brings into focus the perils of judicial oversight of SEC settlements after the adversarial process has melted away. This Court previously commented on that peculiar conundrum in the context of the Research Analyst settlements. See SEC v. Bear Stearns & Co. Inc., 626 F. Supp. 2d 402 (S.D.N.Y. 2009). Once again, the SEC "pass[es] to the Court responsibility for freighting this substantial consignment . . . without any navigational aids." Bear Stearns, 626 F. Supp. 2d at 405. To better understand the concerns of the Court, a brief recapitulation may be helpful.

On August 11, 2008, GCG was appointed claims administrator in the Private Class Action and tasked with notifying class members, processing claims, and distributing the settlement fund. See In re: SCOR Holding (Switzerland) AG Litig., No. 04 Civ. 7897 (DLC) (ECF No. 251.). The Private class was defined as "all persons or entities who, during the [period of Dec. 11, 2001 through Sept. 2, 2004], (i) were U.S. residents and purchased Converium Common Stock on the SWX Swiss Exchange and/or (ii) purchased Converium

American Depository Shares ("ADS") on the New York Stock Exchange." In re: SCOR Holding (Switzerland) AG Litig., No. 04 Civ. 7897 (DLC) (ECF Nos. 251, 264). As of November 30, 2008, GCG had mailed a total of 14,154 Claim Packets. (Declaration of Stephen J. Cirami, dated Dec. 5, 2008 ("Cirami I") ¶ 4.) By September 30, 2010, GCG had received and processed 1,636 Proofs of Claim and accepted 589. (Declaration of Stephen J. Cirami, dated Sept. 30, 2010 ("Cirami II") ¶¶ 5, 36.) In processing the claims, GCG reported that it had (i) defined project guidelines, (ii) created a unique database to store claim information and documentation, (iii) trained staff to process claims, (iv) formulated telephone and e-mail systems to respond to inquiries, (v) developed computer programs to enter claim data, and (vi) developed a program to calculate loss amounts. (Cirami II ¶ 6.) GCG charged a total of $357,378.19 in fees and expenses for its administration of the Private Class Action fund. (Cirami II ¶ 37.)

    The SEC recommended GCG as claims administrator to this Court because both the Private Class Action and the SEC Action "involve identifying and locating Converium shareholders, and the work GCG has done on the Class Action distribution will help it perform the [Fair Fund] distribution in a more efficient and cost effective manner." (See Declaration of James McGovern, dated Sept. 15, 2009 ("McGovern Decl.") ¶ 9.) Under the SEC's Distribution Plan, an investor was eligible for distribution if he "held Converium Common Stock as of the open of the Swiss markets on November 4, 2005 and/or Converium ADSs as of the open of the U.S. markets on November 4, 2005." (ECF No. 11-4.) To solicit claims from investors in foreign countries with the highest percentage of Converium shareholders, the SEC plan required GCG to publish notice in six nations at an estimated cost of $520,000. (McGovern Decl. ¶ 20.)

In addition, GCG agreed to cap its fees at $375,000, not including expenses, publication costs, or audit costs, assuming that GCG mailed 30,000 Claim Packets and processed 6,000 claims. (McGovern Decl. ¶ 19.)

In its fifth progress report docketed April 4, 2011, GCG reported mailing approximately 55,000 Claim Packets, processing 4,342 claims, and determining that 1,383 claims were eligible, with a total eligible loss amount of $40,021,834.11. (ECF No. 36.) GCG's most recent progress report docketed July 20, 2011, reported receiving twelve additional claims, only one of which may be eligible for an inconsequential sum. (ECF No. 37.)

While GCG's request for $528,673.88 in publication costs is in line with the estimate in the Distribution Plan, the question that occurs to this Court, but apparently not to the SEC, is, was such an expensive notice program effective? Of course, neither the SEC nor GCG provide any information to answer that question. Astonishingly, the SEC never informed this Court that GCG undertook a significant advertising campaign in connection with the Private Class Action. In fact, GCG billed the Class Action fund $58,908.39 to publish notices in The Wall Street Journal (Global), The Economist (Europe), Neue Zucker Zeitung ((Switzerland – German), Le Temps (Switzerland – French), and PR Newswire (US and Europe). Nor did the SEC inform this Court that GCG mailed individual notices and proofs of claim to potential class members, including class members residing in Switzerland. Had this Court been apprised of the notice and publication efforts in the Private Class Action, it would have questioned the SEC closely about the utility of an enormously expensive publication program in the SEC Action. Certainly, the incremental value of such a notice program is an open question.

While the SEC and GCG undoubtedly have more expertise than this Court in reaching out to aggrieved investors, it would seem that one of the most effective ways to reach Zurich and Converium investors would be to put a notice concerning the SEC Action and a link to the Fair Fund website on the Zurich and Converium websites. Apparently, GCG contacted Zurich and Converium to do just that. But both expressly declined to post any link or notice on their respective websites. While that development was relegated to a footnote in GCG's first progress report, (see ECF No. 23, 3, n.2), the SEC neither raised it with this Court nor made any application.

In ostrich-like fashion, the SEC does not even bother to submit a single piece of paper on GCG's cumulative motions for payment of fees and expenses totaling $1,083,911.88. Instead, the SEC apparently permitted an officer of GCG to make the following representation to this Court in the November 3, 2010 motion:

> GCG has been advised that the staff of [sic] United States Securities and Exchange Commission has reviewed GCG's invoice and has no objection to payment of the invoice in full. (ECF Nos. 26, 27.)

Then, GCG's April 4, 2011 motion for authority to distribute the Fair Fund to eligible claimants, was even bolder, styling itself as an "Unopposed Motion of the Claims Administrator," and asserting that "the [SEC] concurs with the Claims Administrator's Motion." (ECF No. 35.) The SEC's laissez-faire attitude is remarkable and wholly unacceptable. An agency of the United States Government, especially one charged with enforcing the securities laws, should speak for itself when it is a litigant.

But in this Court's experience, the SEC's natural, bureaucratic proclivity is to avoid responsibility. Indeed, no SEC attorney is identified in the pending motions as binding the

Commission to the position staked out by GCG, a private, for-profit claims administrator. Such administrative acquiescence is unseemly. Because the SEC has failed to provide any information about the effectiveness of the advertising campaign, this Court cannot assess it. And if that expensive campaign turned out to be a mistake, the SEC is likely doomed to repeat it. Neither the SEC nor this Court will know whether it was a mistake unless the SEC makes some sort of inquiry.

As such, this Court directs the SEC to perform its duty and evaluate the effectiveness of the advertising program it proposed by, among other things, comparing the investors identified in the Class Action with the investors identified in the SEC Action and reporting how many claimants learned of the Fair Fund through the publication program. The SEC is also directed to compare the claims approved in the Private Class Action with the claims approved in the SEC Action. Further, among other matters, the SEC needs to explain why the procedures used to identify U.S. investors in the Private Class Action were not adequate to identify foreign investors in the SEC Action.

GCG's remaining fees and expenses are, as yet, unjustified in view of the work it has already done administering the Private Class Action fund. To justify its fees, GCG states that the work administering the fund "included the construction of a database to administer the Distribution Fund, . . . building a calculation module to compute the Recognized Losses of each claimant, setting up and maintaining a toll-free number for claimant communications, handling claimant communications by phone, email, and post, creating a case-specific website where claimants were able to file claims electronically, and other tasks that were described and approved in the Distribution Plan." (Declaration of Stephen J. Cerami, dated Oct. 29, 2010

("Cerami III") ¶ 4.) This formulaic recital is strikingly similar to GCG's recital in support of its fee application in the Private Class Action. On their face, these tasks appear largely duplicative of the work done administering the Private Class Action fund, (see Cerami II ¶ 6), and are fees and expenses the SEC represented would be avoided if this Court appointed GCG as Claims Administrator in the SEC Action. For example, GCG seeks fees for the development of a procedure to calculate the Recognized Losses of the claimants. There should have been significant overlap with the work done in calculating the Recognized Losses of the Private Class Action. But there is no accounting or explanation for what was done. And this is not an academic exercise—the eligible loss amount of $40,021,834.11 substantially exceeds the fund available for distribution to aggrieved investors.

In another vein, GCG reported in the Private Class Action that class members would receive approximately 55% of their Recognized Losses. In the SEC Action, GCG reports that claimants will receive nearly 59% of losses. Without a proper accounting, it is impossible to ascertain whether any investor is receiving a payment that exceeds his loss. Here again, the SEC's Distribution Plan provided for an independent outside accounting firm—EisnerAmper LLP—to audit the claims processed by GCG. But the audit report is singularly unhelpful. And this Court wonders why the SEC decided in this case that an outside accounting firm was necessary to check GCG's homework.

To be clear, this Court understands that the number of claims in the SEC Action is higher than the number of claims in the Private Class Action. Yet, GCG provides little basis for this Court, the SEC, claimants, or anyone else to conclude that GCG took full advantage of the work already done in the Private Class Action. At best, GCG states generically that it compiled

names and addresses of potential claimants from, among other sources, "the database compiled in connection with the Class Action." (See Affirmation of Stephen J. Cirami, dated Apr. 4, 2011 ("Cirami IV") ¶ 7.) Nor does GCG even bother to justify why its fees of $455,471.35 should exceed the agreed cap of $375,000. See Nortel Networks Corp. Sec. Litig., No. 01 Civ. 1855 (RMB), 2010 WL 3431152, at *3 (S.D.N.Y. Aug. 20, 2010) (reducing GCG's fees for, inter alia, failing to explain why its fees in a period in which it made no distributions exceeded fees in a period in which it did). And in the Private Class Action involving distribution of $84.6 million, GCG sought fees and expenses of $357,378.19, just four tenths of one percent of the fund. But in the SEC Action, GCG seeks $1,083,911.88, or more than 4.3% of the $25 million to be distributed. It is time for the SEC to explain why it believes that the cost of distributing a Fair Fund dollar should be nearly ten times higher than the cost of distributing a Private Class Action dollar.

Accordingly, because GCG fails to justify its requested fees and expenses, and the SEC appears to have conducted no meaningful oversight, GCG's request is denied without prejudice. The SEC is directed to respond to the issues raised in this Memorandum & Order by October 28, 2011. The Clerk of the Court is directed to terminate the motions pending at Docket Entry Nos. 26 and 35.

Dated: September 30, 2011
      New York, New York

                              SO ORDERED:

                              WILLIAM H. PAULEY III
                              U.S.D.J.

*Counsel of Record:*

Andrew M. Calamari, Esq.
Securities and Exchange Commission
Northeast Regional Office
3 World Financial Center, Room 400
New York, NY 10281
*Counsel for Plaintiff*

Ralph C. Ferrara, Esq.
Dewey & LeBoeuf LLP
1101 New York Avenue, NW
Washington, DC 20005
*Attorney for Defendant*

*Also copied to:*

The Garden City Group, Inc.
Claims Administrator
105 Maxess Road
Melville, New York 11747